UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SPT CHATSWORTH, LLC,

                              Plaintiff,                              20-cv-8502 (PKC)

          -against-                                                  OPINION
                                                                     AND ORDER

HFZ 344 WEST 72ND STREET LLC, et al.,

                              Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

          Plaintiff SPT Chatsworth Holdings, LLC is the successor in interest under four

loan agreements with certain borrowers who thereafter failed to repay the promissory notes

issued pursuant to those agreements on their maturity dates.[1]  The borrowings related to the

development of residential cooperative units at 344 West 72nd Street on the Upper West Side of

Manhattan.  The remaining borrower defendants are HFZ 344 West 72nd Street LLC ("Senior

Borrowers"),[2] HFZ 344 West 72nd Street Mezz LLC ("Mezzanine Borrower"), HFZ 344 West

72nd Street Holdco LLC ("Unsecured Borrower"), HFZ 344 West 72nd Street Two LLC

("Inventory Borrower") (collectively, the "Borrowers"). HFZ Capital Group LLC, Ziel Feldman

and Helene Feldman (collectively, the "Guarantors") guarantied repayment of the loans and are

also defendants in this action.

          SPT now moves for summary judgment against the Borrowers and the

Guarantors.  For the reasons set forth below, SPT's motion will be granted.

---

[1] Subject matter jurisdiction is premised upon diversity of citizenship.  28 U.S.C. § 1332(a).
[2] Defendant Chatsworth Realty Corporation, a Senior Borrower, was dismissed by stipulation and order of January 24, 2022 (Doc. 64.).  The caption of the action will be modified as indicated above.

BACKGROUND

        In connection with the preparation of a Joint Pre-Trial Order, the parties have stipulated to most of the facts relevant to the disposition of this motion.  Because of the evidentiary significance of the stipulation and its thorough review of the relevant facts, the Court sets it out in full.

        Before the reader undertakes a review of the particulars of the loan agreements, promissory notes and guaranties, it is useful to begin by summarizing what is not in dispute and what the Borrowers and Guarantors assert are their defenses to summary judgment.  There is no dispute that the loan agreements, notes and guaranties are valid agreements enforceable in accordance with their terms. There is no dispute that the borrowings remain unpaid.  In opposition to the motion, there is no claim of fraud, mistake, impossibility of performance, inequitable conduct or economic duress, although each were among the affirmative defenses in the Borrowers' and Guarantors' answers to the Complaint.

        As will be addressed, the Borrowers and Guarantors argue that the "Senior Borrower" had no less that forty-five days to purchase certain "Units" and was deprived of that opportunity, thereby negating the Guarantors' obligation to perform.  Relatedly, defendants argue that the demand for the Guarantors' performance was premature.  And, finally, they argue that the "Mandatory Purchase Guaranty" is unenforceable because it imposes a greater obligation on the Guarantors than the underlying obligations of the Borrowers.

        With that summary, the stipulated facts are as follows:

1.      On or about December 31, 2012, German American Capital Corporation ("GACC") made a loan to HFZ 344 West 72nd Street LLC ("Senior Borrower") and HFZ 344 West 72nd Street Owner LLC ("Street Owner") in the maximum principal amount of

$152,000,000.00 (the "Senior Loan") as evidenced by the terms of that certain Loan Agreement dated December 31, 2012 (the "Senior Loan Agreement"), by and among Senior Borrower, Street Owner, Deutsche Bank Trust Company Americas ("Deutsche"), and GACC.

2.      The Senior Loan is evidenced and secured by that certain (i) Consolidated, Amended and Restated Promissory Note 1 dated as of December 31, 2012, in the original principal amount of $93,304,198.62, made by Senior Borrower and Street Owner to and in favor of Deutsche as agent for GACC (the "Senior Note 1"); (ii) Promissory Note 2 dated as of December 31, 2012 in the original principal amount of $58,695,801.38, made by Senior Borrower and Street Owner to and in favor of Deutsche as agent for GACC (the "Senior Note 2", and together with Senior Note 1, the "Senior Notes"); (iii) Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 31, 2012, by Street Owner to and in favor of Deutsche as agent for GACC (the "Mortgage"), encumbering certain real property located as 340-344 West 72nd Street, New York, New York 10023 (the "Property"); and (iv) various other documents executed in connection therewith (collectively with the Senior Loan Agreement, the Senior Notes and the Coop Pledge (as hereinafter defined), as amended, restated, replaced, modified, supplemented and assigned, the "Senior Loan Documents").

3.      Pursuant to that certain First Omnibus Amendment to Loan Documents dated as of January 28, 2016, the Senior Loan and Senior Loan Documents were amended to, among other things, redefine the term "Maturity Date" to mean the earlier to occur of (i) the sale of the

last Unsold Unit, (ii) the Extension Maturity Date, or (iii) such earlier date the final payment of principal on the Senior Notes becomes due.

4.        On or about May 2, 2016, (i) Street Owner transferred title to the Property to Chatsworth Realty Corporation ("Coop Corporation"), (ii) Street Owner was released as a Borrower under the Senior Loan (and thus the Mortgage was released from the Property), (iii) the Property was converted into a housing cooperative, and (iv) Senior Borrower, as owner of the unsold shares of the Coop Corporation and the housing units allocated thereto, pledged those units as security for the Senior Loan (the "Senior Units").

5.        On or about September 20, 2016, Starwood Property Mortgage, L.L.C. ("Starwood") purchased the Senior Loan and Senior Loan Documents from GACC.

6.        Pursuant to that certain Second Omnibus Amendment to Loan Documents dated as of March 22, 2017, the Senior Loan and Senior Loan Documents were amended to, among other things, redefine the term "Maturity Date" to mean the earlier to occur of (i) the sale of the last Unsold Unit, (ii) the Modified Maturity Date or (iii) such earlier date the final payment of principal on the Senior Notes becomes due.

7.        Pursuant to that certain Third Omnibus Amendment to Senior Loan Documents dated as of September 27, 2018 (the "Third Senior Omnibus Amendment"), the Senior Loan and

Senior Loan Documents were amended to, among other things, extend the Modified Maturity Date of the Senior Loan to December 31, 2019.

8.      Pursuant to the Third Senior Omnibus Amendment, Section 5.1 of the Senior Loan Agreement was amended to, among other things, add Section 5.1.49 entitled "Mandatory Purchase of Mandatory Purchase Units."

9.      Section 2(a) of the Third Senior Omnibus Amendment provides: "From and after the Modification Closing Date, the Original Loan Agreement is hereby amended as follows: . . . (xx) 'Mandatory Purchase Event of Default' shall mean the failure by Borrower to close on the sale of all Unsold Units within forty-five (45) days of a Mandatory Purchase Acceleration Event."

10.      Pursuant to the Third Senior Omnibus Amendment, if an Event of Default occurred thereunder ". . . based upon either (i) the failure to make any Required Monthly Debt Service Payment Amount under the Loan Agreement or Mezzanine Loan Agreement or the failure to make any payment of interest on the Outstanding Principal Balance under the Unsecured Loan Agreement or (ii) the failure to timely close on a Mandatory Purchase pursuant to . . . Section 5.1.49 (either (i) or (ii), a "Mandatory Purchase Acceleration Event"), Borrower [would] be obligated to close on the sale of all Unsold Units within forty-five (45) calendar days

after the occurrence of a Mandatory Purchase Acceleration Event in accordance with the terms

and provisions [t]hereof."

11.    Section 5.1.49(k) of the Third Senior Omnibus Agreement further provided that

"Borrower's failure to close on the sale of all Unsold Units within such forty-five calendar day

period shall be a Mandatory Purchase Event of Default . . . ."

12.    Section 5.1.49(n) of the Third Senior Omnibus Amendment provides, in part, that:

> Upon the occurrence of a Mandatory Purchase Acceleration Event, Agent,
> Lender, Mezzanine Lender and Unsecured Lender shall not be prohibited from
> exercising any remedies available to such parties after the occurrence or such
> Mandatory Purchase Acceleration Event; provided that Lender shall not take title
> to any of the Collateral within forty-five (45) days immediately following the
> Mandatory Purchase Acceleration Event. During such fortyfive (45) day period,
> Borrower shall have a one-time right to cure the Mandatory Purchase
> Acceleration Event by curing all then outstanding Events of Default, including the
> underlying Events of Default that gave rise to the Mandatory Purchase
> Acceleration Event. For avoidance of doubt, such cure right shall not constitute a
> cure period and shall not affect Lender's right to exercise remedies as aforesaid.

13.    In connection with the Third Senior Omnibus Amendment, the Guarantors

entered into that certain Mandatory Purchase Guaranty dated as of September 27, 2018 (the

"Mandatory Purchase Guaranty").

14.    Under Section 1.1(a) of the Mandatory Purchase Guaranty, the Guarantors

"absolutely, irrevocably and unconditionally" guaranteed the "payment and performance of the

Guaranteed Obligations . . . as and when the same shall be due and payable, whether by lapse of

time, by acceleration of maturity or otherwise." The Mandatory Guaranty defines "Guaranteed

Obligations" as the "Mandatory Purchase Price Payment Obligation" which, as amended,

includes the purchase of all remaining Unsold Units or the payment in full of the aggregate total

of the Designated Value of all of the Unsold Units upon the occurrence of a Mandatory Purchase Event of Default.

15.     Section 1.1(b) of the Mandatory Purchase Guaranty defined the "Guaranteed Obligations" as the Mandatory Purchase Price Payment Obligation and provided that "'Mandatory Purchase Price Payment Obligation'" shall mean, upon the occurrence of a mandatory Purchase Event of Default, the payment in full to the Lenders, in the order and priority set forth in Section 7.4 of the Senior Loan Agreement, of (i) the aggregate total of the Designated value of all Units set forth on Exhibit A attached hereto and made a part hereof, (ii) minus, for each Unit sold after the date hereof and prior to the occurrence of such Mandatory Purchase Event of Default (1) the proceeds of sale actually received by Agent or Senior Lender . . . or (2) the Designated Value tendered to Agent or Senior Lender with respect to any Unit purchased by Inventory Buyer or SPE Purchaser, as the case may be, prior to the occurrence of the Mandatory Purchase Event of Default . . . ."

16.     Section 1.4 of the Mandatory Purchase Guaranty provides that "[i]f all or any part of the Guaranteed Obligations shall not be paid following thirty (30) calendar days' written notice to Guarantor from any Lender, whether at demand, maturity, acceleration or otherwise, Guarantor shall, following such notice by such lender . . . pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to such Lender . . . ."

17.     The Mandatory Purchase Guaranty defines a Mandatory Purchase Event of Default as "the failure by the Senior Borrower to close on the sale of all outstanding Units within forty-five (45) calendar days after the occurrence of an Event of Default based upon either (i) the failure to make any Required Monthly Debt Service Payment Amount under the Senior Loan Agreement or Mezzanine Loan Agreement or the failure to make any payment of interest on the

Outstanding Principal Balance under the Unsecured Loan Agreement, or (ii) the failure to timely close on a Mandatory Purchase Event pursuant to Section 5.1.49 of the Senior Loan Agreement."

18.     Pursuant to that certain Allonge for Senior Note 1 dated as of July 26, 2019, that certain Allonge for Senior Note 2 dated as of July 26, 2019 and that certain Assignment and Assumption of Agreements and Accounts dated as of July 26, 2019, Starwood transferred all its right, title and interest in and to the Senior Loan and the Senior Loan Documents to SPT Real Estate Capital ("SPT").

19.     Pursuant to that certain Omnibus Modification Agreement for Senior Loan, Mezzanine Loan and Unsecured Loan dated as of December 30, 2019 (the "Final Omnibus Amendment"), the Loan Agreements, Mandatory Purchase Guaranty and each of the other Loan Documents were amended to, among other things, extend the maturity date to January 31, 2020.

20.     Pursuant to the Final Omnibus Amendment, Section 1.1(d) of the Mandatory Purchase Guaranty was deleted in its entirety and replaced such that the term "Mandatory Purchase Price Payment Obligation" was amended to include, among other things, either the purchase of the remaining Unsold Units or the payment in full of the aggregate total of the Designated Value of all Units minus certain designated amounts in connection with Units that were sold.

21.     Pursuant to Section 4(b) of the Final Omnibus Amendment, Section 1.1(c) of the Mandatory Purchase Guaranty was deleted in its entirety and replaced as follows: "As used herein, the term "Mandatory Purchase Event of Default" means (1) the failure by Senior Borrower to close on the sale of all Unsold Units within forty-five (45) calendar days after the occurrence of an Event of Default based on either (i) the failure to make any Required Monthly Debt Service Payment Amount under the Senior Loan Agreement or Mezzanine Loan

Agreement or the failure to make any payment of interest on the Outstanding Principal Balance under the Unsecured Loan Agreement, or (ii) the failure to timely close on a Mandatory Purchase pursuant to Section 5.1.49 of the Senior Loan Agreement; (2) the failure by Senior Borrower to close on the sale of Units 301, 1101 and 1208 as required by the terms of this Agreement; or (3) the failure to pay the Senior Debt in full [by January 31, 2020].

22.     Pursuant to that certain (i) Allonge dated as of October 12, 2020 and (ii) Assignment and Assumption of Agreements and Accounts dated as of October 12, 2020, SPT transferred all of its right, title and interest in and to the Senior Loan and the Senior Loan Documents to Chatsworth Holdings.

23.     Pursuant to that certain Mezzanine Loan Agreement, dated as of December 31, 2012 (the "Mezzanine Loan Agreement"), by and among HFZ 344 West 72nd Street Mezz LLC ("Mezzanine Borrower") and CPUSI SS Securities, LLC ("CPUSI"), CPUSI made a loan to Mezzanine Borrower in the maximum principal amount of $50,000,000.00 (the "Mezzanine Loan").

24.     The Mezzanine Loan is evidenced by that certain Mezzanine Promissory Note dated as of December 31, 2012 in the original principal amount of $50,000,000.00 (the "Mezzanine Note" and together with the Mezzanine Loan Agreement, as amended, restated, replaced, modified, supplemented and assigned, the "Mezzanine Loan Documents").

25.     Pursuant to that certain Allonge (Chatsworth) dated as of August 29, 2014, and that certain Assignment and Assumption Agreement (Chatsworth Mezzanine Loan) dated as of

August 29, 2014, CPUSI transferred all of its right, title and interest in and to the Mezzanine Loan and the Mezzanine Loan Documents to Starwood.

26.     Pursuant to that certain First Omnibus Amendment to Mezzanine Loan Documents dated as of January 28, 2016, the Mezzanine Loan and Mezzanine Loan Documents were amended to, among other things, redefine the term "Maturity Date" to mean the earlier to occur of (i) the sale of the last Unsold Unit, (ii) the Extension Maturity Date, or (iii) such earlier date the final payment of principal on the Senior Notes becomes due.

27.     Pursuant to that certain Second Omnibus Amendment to Mezzanine Loan Documents dated as of March 22, 2017, the Mezzanine Loan and Mezzanine Loan Documents were amended to, among other things, redefine the term "Maturity Date" to mean the earlier to occur of (i) the sale of the last Unsold Unit, (ii) the Modified Maturity Date or (iii) such earlier date the final payment of principal on the Senior Notes becomes due.

28.     Pursuant to that certain Third Omnibus Amendment to Mezzanine Loan Documents dated as of September 27, 2018, the Mezzanine Loan and Mezzanine Loan Documents were amended to, among other things, extend the Modified Maturity Date of the Mezzanine Loan to December 31, 2019.

29.     Pursuant to that certain (i) Allonge dated as of July 26, 2019 and (ii) Assignment and Assumption of Agreements and Accounts dated as of July 26, 2019, Starwood transferred all

of its right, title and interest in and to the Mezzanine Loan and the Mezzanine Loan Documents to SPT.

30.    Pursuant to the Final Omnibus Amendment, the Mezzanine Loan and Mezzanine Loan Documents were amended to, among other things, extend the Modified Maturity Date of the Mezzanine Loan to January 31, 2020.

31.    Pursuant to that certain (i) Allonge dated as of October 12, 2020 and (ii) Assignment and Assumption of Agreements and Accounts dated as of October 12, 2020, SPT transferred all of its right, title and interest in and to the Mezzanine Loan and the Mezzanine Loan Documents to Chatsworth Holdings.

32.    Pursuant to that certain Unsecured Loan Agreement, dated as of March 22, 2017 (the "Unsecured Loan Agreement" and together with the Senior Loan Agreement and the Mezzanine Loan Agreement, the "Loan Agreements"), Starwood made a loan to HFZ 344 West 72nd Street Holdco LLC ("Unsecured Borrower") in the maximum principal amount of $12,000,000.00 (the "Unsecured Loan" and together with the Senior Loan and Mezzanine Loan, the "Loans").

33.    The Unsecured Loan is evidenced by that certain Unsecured Loan Promissory Note dated as of March 22, 2017 in the original principal amount of $12,000,000.00 (the "Unsecured Note" and together with the Unsecured Loan Agreement, as amended, restated, replaced, modified, supplemented and assigned, the "Unsecured Loan Documents").

34.    In connection with the Unsecured Loan, the Guarantors executed that certain Guaranty dated as of March 22, 2017 (the "Unsecured Guaranty"). Article 1 of the Unsecured

Guaranty provides that the Guarantors are obligated for the payment of all monetary obligations under the Unsecured Loan Documents.

35.    Under Section 1 of the Unsecured Guaranty, the Guarantors "jointly and severally, unconditionally, absolutely and irrevocably" guaranteed the "punctual payment when due, whether by lapse of time, by acceleration of maturity, or otherwise, and the punctual performance of the Guaranteed Obligations" which includes the payment of all amounts due and owing under the Unsecured Loan Documents.

36.    Pursuant to that certain Omnibus Amendment to Unsecured Loan Documents dated as of September 27, 2018, the Unsecured Loan and Unsecured Loan Documents were amended to, among other things, extend the Maturity Date of the Unsecured Loan.

37.    Pursuant to that certain (i) Allonge dated as of July 26, 2019 and (ii) Assignment and Assumption of Agreements and Accounts dated as of July 26, 2019, Starwood transferred all of its right, title and interest in and to the Unsecured Loan and the Unsecured Loan Documents to SPT.

38.    Pursuant to the Final Omnibus Amendment, the Unsecured Loan and Unsecured Loan Documents were amended to, among other things, extend the Maturity Date of the Unsecured Loan to January 31, 2020.

39.    Pursuant to that certain (i) Allonge dated as of October 12, 2020 and (ii) Assignment and Assumption of Agreements and Accounts dated as of October 12, 2020, SPT

transferred all of its right, title and interest in and to the Unsecured Loan and the Unsecured Loan Documents to Chatsworth Holdings.

40.     Each of the Loan Agreements, as amended, identifies the maturity date of each of the Loans as January 31, 2020.

41.     Senior Borrower failed to pay the outstanding balance on the Senior Loan on or before January 31, 2020 (the "Senior Maturity Default"). A failure to pay the outstanding balance on the Senior Loan on or before January 31, 2020 is listed as an Event of Default under the Senior Loan Documents pursuant to Section 8.1(a)(i) of the Senior Loan Agreement.

42.     Mezzanine Borrower failed to pay the outstanding balance on the Mezzanine Loan on or before January 31, 2020 (the "Mezz Maturity Default"). A failure to pay the outstanding balance on the Mezzanine Loan on or before January 31, 2020 is listed as an Event of Default under the Mezzanine Loan Documents pursuant to Section 8.1(a)(i) of the Mezzanine Loan Agreement.

43.     Unsecured Borrower failed to pay the outstanding balance on the Unsecured Loan on or before January 31, 2020 (the "Unsecured Maturity Default" and together with the Senior Maturity Default and the Mezz Maturity Default, the "Maturity Defaults") and a failure to pay the outstanding balance on the Unsecured Loan on or before January 31, 2020 is listed as an Event of Default under the Unsecured Loan Documents pursuant to Section 8.1(a)(i) of the Unsecured Loan Agreement. Demands on the Borrowers and Guarantors.

44.     By letters dated September 4, 2020 (collectively, the "Default Notices"), Senior Borrower, Mezzanine Borrower, Unsecured Borrower and Guarantors were each provided

written notice of the existence of certain Events of Default, including but not limited to the Maturity Defaults.

45.    One of the Default Notices also advised the Senior Borrower and Guarantors to "[b]e advised that as a result of the Senior Maturity Default, and in accordance with [the Final Omnibus Amendment], Guarantors' liability under the Mandatory Purchase Guaranty has been triggered as a result of the existence of a Mandatory Purchase Event of Default."

46.    One of the Default Notices also stated that as a result of the Senior Borrower's ". . . fail[ure] to close on the sale of the Mandatory Purchase Units with respect to the Applicable Monthly Sales Hurdle for April 2019, as extended, in accordance with Section 5.1.49 of the Senior Loan Agreement, a Mandatory Purchase Acceleration Event had occurred, ". . . triggering Borrower's obligation to close on the sale of all Unsold Units within forty-five (45) calendar days" and that "[f]ailure to do so [would] result in an additional Mandatory Purchase Event of Default under the Mandatory Purchase Guaranty."

47.    Despite the demand for payment, Senior Borrower failed to pay the Senior Loan in full.

48.    Despite the demand for payment, Mezzanine Borrower has failed to pay the Mezzanine Loan in full.

49.    Despite the demand for payment, Unsecured Borrower has failed to pay the Unsecured Loan in full.

50.    By letter dated September 4, 2020, Plaintiff also made demand upon the Guarantors for the purchase of all Unsold Units or the payment in full of the aggregate total of

- 14 -

the Designated Value of the remaining Unsold Units (the "Mandatory Purchase Guaranty Demand").

51.    The aggregate total of the Designated Value of the Unsold Units is $98,178,163.

52.    Guarantors did not purchase the Unsold Units or pay the amounts due and owing under the Mandatory Purchase Guaranty within thirty (30) days of Plaintiff's written demand.

53.    In accordance with Section 2(b) of the Unsecured Guaranty and based upon the existence of the Maturity Defaults, by letter dated September 11, 2020, Plaintiff made demand upon the Guarantors for the payment of all amounts due and owing under the Unsecured Loan Documents (the "Unsecured Guaranty Demand").

54.    Guarantors did not pay the amounts due and owing under the Unsecured Loan Documents within ten (10) days of Plaintiff's written demand.

55.    On October 13, 2020 Plaintiff notified Mezzanine Borrower that it was "exercising Lender's right to assign, transfer and register, as applicable, all equity interests of the Borrower to and in the name of Lender as if Lender was the absolute owner thereof."

56.    Plaintiff held a public UCC sale on April 6, 2021 for each of the fourteen (14) residential cooperative units pledged as collateral for the Senior Loan.

57.    Pursuant to that certain Inventory Loan Agreement, dated as of September 27, 2018 (the "Inventory Loan Agreement"), by and between HFZ 344 West 72nd Street Two LLC ("Inventory Borrower") and Starwood, Starwood made a loan to Inventory Borrower in the maximum principal amount of $130,207,000.00 (the "Inventory Loan").

58.    The Inventory Loan is evidenced and secured by, inter alia, (i) that certain Inventory Loan Promissory Note dated as of September 27, 2018 in the original principal amount of $130,207,000.00, made by Inventory Borrower to and in favor of Starwood (the "Inventory

Note"), and (ii) various other documents executed in connection therewith (collectively with the Inventory Loan Agreement, the Inventory Note and the Inventory Pledges (as hereinafter defined), as amended, restated, replaced, modified, supplemented and assigned, the "Inventory Loan Documents").

59.     In connection with the Inventory Loan, the Guarantors executed that certain Inventory Loan Guaranty dated as of September 27, 2018 (the "Inventory Guaranty"). Article 1 of the Inventory Guaranty provides that the Guarantors are obligated for the payment of all monetary obligations under the Inventory Loan Documents.

60.     Under Section 1.1 of the Inventory Guaranty, the Guarantors "absolutely, irrevocably and unconditionally" guaranteed the "the payment and performance of all of Borrower's payment and other monetary obligations under the Loan Documents as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise . . . as a primary obligor."

61.     From January 11, 2019 until November 22, 2019, pursuant to the terms of the Inventory Loan Documents, proceeds from the Inventory Loan were used to purchase from the Senior Borrower certain shares of the Coop Corporation and housing units allocated thereto related to Units 909, 908, 1204, 508, 1106, 409, 609, 4G (a/k/a 402), A-3A, A-4A and TH 4 (the "Inventory Units").

62.     Pursuant to that certain Allonge dated as of July 26, 2019 and that certain Assignment and Assumption of Agreements and Accounts dated as of July 26, 2019, Starwood

transferred all of its right, title and interest in and to the Inventory Loan and the Inventory Loan Documents to SPT.

63.     Pursuant to that certain (i) Allonge dated as of October 12, 2020 and (ii) Assignment and Assumption of Agreements and Accounts dated as of October 12, 2020, SPT transferred all of its right, title and interest in and to the Inventory Loan and the Inventory Loan Documents to Chatsworth Holdings.

64.     Inventory Borrower failed to remit the Debt Service due on or before October 1, 2020 as required by Section 2.2 of the Inventory Loan Agreement.

65.     By letter dated October 2, 2020, Inventory Borrower was provided written notice that it was in default under the terms of the Inventory Loan Documents and was given five (5) business days in which to remit the funds necessary to cure the default.

66.     Inventory Borrower failed to cure the default under the terms of the Inventory Loan Documents. A failure to cure such a default is listed as an Event of Default under the

Inventory Loan Documents pursuant to Section 8.1(a)(i) of the Inventory Loan Agreement (a "Inventory Default").

67.     By letter dated October 13, 2020, Inventory Borrower was provided written notice that the Maturity Date of the Inventory Loan had been accelerated as a result of the Inventory Default (the "Inventory Default Notice").

68.     By letter dated October 13, 2020, the Guarantors were provided written notice that their obligations under the Inventory Guaranty had arisen as a result of the Inventory Default (the "Inventory Guaranty Demand").

69.     Chatsworth Holdings held a public UCC sale on April 6, 2021 for each of the eleven (11) residential cooperative units pledged as collateral for the Inventory Loan.

70.     Pursuant to Section 10.13 of the Loan Agreements, Senior Borrower, Mezzanine Borrower, Unsecured Borrower and Inventory Borrower are each responsible for the payment of all reasonable fees, costs and expenses (including attorneys' fees) incurred in any action to enforce the Loan Documents or to collect any payments due from the Borrowers.

71.     Section 1.7 of the Mandatory Purchase Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred by Plaintiff

- 18 -

as a result of any breach and failure to timely perform their obligations under the Mandatory Purchase Guaranty.

72.     Section 10 of the Unsecured Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred by Plaintiff as a result of any breach and failure to timely perform their obligations under the Unsecured Guaranty.

73.     Section 1.7 of the Inventory Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred by Plaintiff as a result of any breach and failure to timely perform their obligations under the Inventory Guaranty.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving

party must come forward with admissible evidence sufficient to raise a genuine issue of fact for

trial in order to avoid summary judgment." <u>Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun

Club, Inc.</u>, 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant

carries only "a limited burden of production," but nevertheless "must 'demonstrate more than

some metaphysical doubt as to the material facts,' and come forward with 'specific facts

showing that there is a genuine issue for trial'." <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d

79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)).

A court "may grant summary judgment only when no reasonable trier of fact could find in favor

of the nonmoving party." <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation

marks omitted).  "When the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim.  In that event, the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." <u>Simsbury-Avon Pres. Soc'y</u>, 575 F.3d at 204 (internal citations

omitted).

DISCUSSION

       A.  Summary Judgment Will Be Granted in
           <u>Favor of SPT Against the Borrowers.</u>

      Under New York law,[3] to recover on a note or other debt instrument "a plaintiff

must show the existence of a promissory note executed by the defendant containing an

unequivocal and unconditional obligation to repay and the failure of the defendant to pay in

---

[3] It is undisputed that the loan documents at issue have New York choice of law provisions.

accordance with the note's terms." <u>Zyskind v. FaceCake Mktg. Techs., Inc.</u>, 101 A.D.3d 550,

551 (1st Dep't 2012).  "Once the plaintiff submits evidence establishing these elements, the

burden shifts to the defendant to submit evidence establishing the existence of a triable issue

with respect to a bona fide defense." <u>Id.</u>; <u>see</u> <u>Camofi Master LDC v. Coll. P'ship, Inc.</u>, 452 F.

Supp. 2d 462, 470 (S.D.N.Y. 2006) (Chin, J.).

        There is no dispute that SPT by allonge or assignment has succeeded to the rights

of the lender under all applicable promissory notes and loan agreements.  (Stip. ¶¶ 22, 31, 39 &

63.)  SPT has come forward with evidence that the Senior Loan Documents, the Mezzanine Loan

Documents and the Unsecured Loan Documents had an amended and extended maturity date of

January 31, 2020.  (<u>Id.</u> ¶ 40.)  In an Omnibus Modification for the Senior Loan, Mezzanine and

Unsecured Loan, dated December 30, 2019, the Borrowers and Guarantors acknowledged that

the Senior Loan Documents, the Mezzanine Loan Documents and the Unsecured Loan

Documents "are in full force and effect" and that the Lender "has the right to enforce Lender's

rights under the Loan Documents."  (Doc 43-7 ¶ 2.)  The December 30, 2019 agreement

modified the maturity date in the three "Loan Documents" as well as the Mandatory Purchase

Guaranty to January 31, 2020.  (<u>Id.</u> ¶ 4(a).)

        The indebtedness owed under the Senior Loan, the Mezzanine Loan and the

Unsecured Loan was not paid as of the January 31, 2020 maturity date by, respectively, the

Senior Loan Borrower, the Mezzanine Loan Borrower and the Unsecured Borrower.  Under each

of the relevant loan documents, as amended and modified, an "Event of Default" is defined to

include "if any portion of the Debt is not paid when due . . . ." (Senior Loan Agreement ¶ 8.1(a),

(Doc 43-2); Mezzanine Loan Agreement ¶ 8.1(a), (Doc 43-10); Unsecured Loan Agreement

¶8.1(a), (Doc 43-13).)  SPT or its predecessor gave due notice of the occurrence of an event of default and the indebtedness remains unpaid.

With respect to the Inventory Loan, the Inventory Borrower failed to remit the Debt Service due on or before October 1, 2020 as required by Section 2.2 of the Inventory Loan Agreement.  (Stip. ¶ 64.)  SPT or its predecessor gave due notice of an event of default.  The balance of indebtedness on the Inventory Loan remains unpaid.

The Senior Loan Borrower, the Mezzanine Loan Borrower, the Unsecured Borrower and the Inventory Borrower have mounted no bona fide defense.  They make much of the fact that "one of the Default Notices also stated that as a result of the Senior Borrower's '. . . fail[ure] to close on the sale of the Mandatory Purchase Units with respect to the Applicable Monthly Sales Hurdle for April 2019, as extended, in accordance with Section 5.1.49[(k)] of the Senior Loan Agreement [added as part of the Third Omnibus Amendment] a Mandatory Purchase Acceleration Event had occurred . . . triggering Borrower's obligation to close on the sale of all Unsold Units within forty-five (45) calendar days' and that '[f]ailure to do so [would] result in an additional Mandatory Purchase Event of Default under the Mandatory Purchase Guaranty'."  The Borrowers assert that there was inadequate notice under the Senior Loan Agreement to fulfill their obligation to close on the sale of all unsold units in time specified.

Assuming, arguendo, the correctness of the Borrowers' contention, it does not negate the existence of maturity date default under the Senior Loan, the Mezzanine Loan and the Unsecured Loan.  Nor does it negate the default under the Inventory Loan.  The September 4, 2020 default notice on the Senior Loan Agreement (Doc 43-18) first noted the default in payment by the maturity date as an "Event of Default."  Further on in the September 4 letter, it stated, "[i]n addition to the Maturity Defaults," there is a "Mandatory Purchase Acceleration

Event."  If SPT was wrong in this assertion, it does not undermine the existence of the default in payment by the maturity date.

SPT has come forward with evidence which if believed would entitle it to judgment against the Borrowers.  In response to SPT's factual showing, the Borrowers have come forward with no facts which, if believed, would amount to a bona fide defense to the obligation to repay the indebtedness on the maturity date as to the Senior Loan, Mezzanine Loan on the Unsecured Loan or the obligations under the Inventory Loan.  Accordingly, the Court will grant summary judgment in favor of SPT against the Borrowers.

SPT will have the opportunity to submit a proposed judgment but, net of collateral sold, the amounts due, inclusive of unpaid principal, interest and default interest, as of August 20, 2021 are no less than: (1) on the Senior Loan, $26,708,860.85; (2) on the Mezzanine Loan, $40,982,952.98; (3) on the Unsecured Loan, $10,810,198.58; and (4) on the Inventory Loan, $12,322,641.10.  (Cowart Decl. ¶¶ 10, 12, 14, 32.)

> B.  Summary Judgment Will Be Granted in
>     Favor of SPT Against the Guarantors.

To recover on a guaranty, a plaintiff must come forward with evidence of "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty . . . ." Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 25 N.Y.3d 485, 492 (2015); Sarfati v. Palazzolo, 142 A.D.3d 877, 877 (1st Dep't 2016); see also UMB Bank N.A. v. Bluestone Coke, LLC, No. 20 Civ. 2043, 2020 WL 6712307 at *4 (S.D.N.Y. 2020) (Liman, J.).[4]

---

[4] By the express terms of each of the agreements, they are governed by New York law.

1.      The Mandatory Purchase Guaranty.

The Guarantors and SPT's predecessor entered into a Mandatory Purchase

Guaranty (Doc 43-6) governing the obligations under the Senior Loan Agreement, the

Mezzanine Loan Agreement and the Unsecured Loan Agreement. (Doc 43-6.)  It expressly

provides as follows:

> Guarantor hereby absolutely, irrevocably and unconditionally
> guarantees to each Lender, and their successors and assigns the
> payment and performance of the Guaranteed Obligations . . . as
> and when the same shall be due and payable, whether by lapse
> of time, by acceleration of maturity or otherwise. Guarantor
> hereby irrevocably and unconditionally covenants and agrees
> that it is liable for the Guaranteed Obligations as a primary
> obligor.[5]

Section 1.1(a).  It further provided that:

> This Guaranty is an irrevocable, absolute, continuing guaranty
> of payment and performance and not a guaranty of collection.
> The obligations of Guarantors under this Guaranty shall be
> primary, irrevocable, direct and immediate and not conditional
> or contingent upon pursuit by any Lender of any remedies it
> may have against any Borrower under its respective Loan
> Agreement or other Loan Documents, or any remedies it might
> have against any other Person.

Section 1.2.

In December 2019, in connection with the Borrowers' successful efforts to secure

SPT's consent to an extension of the maturity dates on the loans to January 31, 2020, the

Borrowers and the Guarantors agreed to certain modifications to their obligations.  With respect

to the Mandatory Purchase Guaranty, the Guarantors agreed as follows:

---

[5] New York recognizes that the "broad, sweeping and unequivocal language" of a contractual guaranty may foreclose any challenge to the enforceability of the agreement "as well as any other possible defense" to the guarantor's liability for the obligations of the principal obligor.  Dresser-Rand Co. v. PDVSA Petroleo, S.A., No. 20 Civ. 1990, 2021 WL 2878936, at *2 (2d Cir. July 9, 2021) (quoting Navarro, 25 N.Y.3d at 494.)

> Section 1.1(c) of the Mandatory Purchase Guaranty is hereby deleted in its entirety and replaced as follows: As used herein, the term "Mandatory Purchase Event of Default" means . . . (3) the failure to pay the Senior Debt in full by the Modified Maturity Date.

(Doc 43-7.)  Thus, the failure of the Senior Borrower to pay the Senior Debt in full by January 31, 2022 triggered the Guarantors' obligations under the Mandatory Purchase Guaranty.

The Mandatory Purchase Guaranty provided that a Mandatory Purchase Event of Default required the Guarantors to pay in full the "Designated Value" of all "Unsold Units" or cause the purchase of all "Unsold Units."  (Section 1.1(d).)  Guarantors' obligation to pay arose 30 days after written notice of a failure to pay any part of the Guaranteed Obligations. Due notice was delivered to the Guarantors on September 4, 2020 (Doc 43-21) and the Guarantors have not paid (Stip. ¶ 51).  The parties agree that "[t]he aggregate total of the Designated Value of the Unsold Units is $98,178,163." (Id. ¶ 52.)

The Guarantors argue that the guaranty was co-extensive with the Borrowers' obligations under the Senior Loan Agreement as modified.  Because the Borrowers were not, in the Guarantors' view, given 45 days to purchase certain Unsold Units, the demand on the Guarantors was premature and ineffective.  It also, in the Guarantors' view, renders the guaranty "defective on its face," presumably because the Guarantors' obligation was triggered before certain rights of the Borrowers were fully exhausted.

It is, of course, true that a guaranty could be drafted to render the guarantor's obligations parallel to the borrower's obligations, but that was not the case here.  The Mandatory Purchase Guaranty provides that the guarantee was "unconditiona[l]" (Section 1.1(a)) and that "[t]he obligations of Guarantors under this Guaranty shall be primary . . . [and] direct . . ." (Section 1.2).  It further provided that "[e]ach Lender's rights under this Guaranty shall be in addition to all rights of such Lender under its respective Note and its respective other Loan

- 25 -

Documents" and were not offset by any claims or defenses of a Borrower.  (Section 1.3.)[6]

Construing the unambiguous agreements of the parties, the rights and remedies available to the

Borrowers in certain circumstances to repurchase unsold units in 45 days did not modify or

negate the Guarantors' unconditional obligation to purchase the Unsold Units or pay the

Designated Value of the Unsold Units 30 days after notice of default.

   Summary judgment will be granted in favor of SPT as against the Guarantors on

the Mandatory Purchase Guaranty in an amount no less that $98,178,163.  (Cowart Decl. ¶ 21.)

   2.  <u>Unsecured Loan Guaranty</u>.

   A separate agreement governed the Guarantors' guaranty of payment of

obligations under the Unsecured Loan Agreement.  (Doc 43-17.)  "Under Section 1 of the

Unsecured Guaranty, the Guarantors 'jointly and severally, unconditionally, absolutely and

irrevocably' guaranteed the 'punctual payment when due, whether by lapse of time, by

acceleration of maturity, or otherwise, and the punctual performance of the Guaranteed

Obligations' which includes the payment of all amounts due and owing under the Unsecured

Loan Documents."  (Stip. ¶ 35.)  The Unsecured Borrower defaulted on their obligation to make

payment at the maturity date, notice of a maturity date default was given to the Guarantors and

the outstanding sums were not paid by the Guarantors in accordance with the guaranty.  (Stip. ¶¶

53–54; Section 2(b); Doc 43-17.)  Through August 20, 2021, the unpaid balance was

$10,810,190.58, including the unpaid principal, interest and default interest. (Cowart Decl. ¶ 14.)

   Summary judgment will be granted in favor of SPT as against the Guarantors on

the Unsecured Loan Guaranty in an amount no less than $10,810,190.58.  (<u>Id.</u> ¶ 24.)

---

[6] "The Guaranteed Obligations and the liabilities and obligations of Guarantor to any Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense (other than the defense that such payment has been made) of any Borrower . . . ." (Section 1.3.)

3.      Inventory Loan Guaranty.

The obligations of the Inventory Loan Borrower were backed by an Inventory Loan Guaranty.  (Doc 43-29.)  The language of the Inventory Loan Guaranty is the same *mutatis mutandis* as the Unsecured Loan Guaranty.   As previously noted, the Inventory Borrower failed to remit the Debt Service due on or before October 1, 2020 as required by Section 2.2 of the Inventory Loan Agreement and due notice of default was given and the default was not timely cured.  (Stip. ¶¶ 64–66.)  The Guarantors were provided written notice that their obligations under the Inventory Guaranty had arisen as a result of the default.  (Id. ¶ 68.)  No payment has been made by the Guarantors under the Inventory Loan Guaranty.

SPT placed certain cooperative units pledged as collateral and was the high bidder at a public sale at $20,000,000.  (Cowart Decl. ¶¶ 30–31.)  More than $12,322,641, inclusive of net unpaid principal, interest and default interest, is owed by the Inventory Borrower and the Guarantors.

Summary judgment will be granted in favor of SPT as against the Guarantors on the Inventory Loan Guaranty in an amount no less than $12,322,641.  (Id. ¶ 24.)

C.      Attorneys' Fees, Costs and Expenses.

Each of the loan agreements entitles SPT to recover attorneys' fees and all other reasonable out of pocket costs and expenses. SPT may file a motion for attorneys' fees, costs and expenses within 21 days of entry of judgment.  Fed. R. Civ. P. 54(d)(2)(B).


CONCLUSION

The Court has considered all the arguments of the parties, including those not expressly addressed herein.  SPT's motion for summary judgment against the Borrowers and the

- 27 -

Guarantors is GRANTED.  SPT shall submit a proposed final judgment within seven days and defendants may respond three days thereafter.  The Clerk is respectfully directed to terminate the motion (Doc 40) and amend the caption to remove Chatsworth Realty Corporation as defendant.

    SO ORDERED.


                                        P. Kevin Castel
                                 United States District Judge


Dated: New York, New York
       February 16, 2022

- 28 -